**FUTURE TECH INTERNATIONAL, INC., a Florida corporation, Plaintiff,**

v.

**TAE IL MEDIA, LTD., Tae IL U.S.A., Inc., Tech Media Computer Systems, Inc., Otomation Engineering, Inc. and Andrew Park, individually, Defendants.**

**No. 95–2512–CIV.**

United States District Court, S.D. Florida.

July 18, 1996.

Andrew C. Hall, Miami, FL, for Plaintiff.

Brian S. Dervishi, Ft. Lauderdale, FL, Thomas M. Karr, Steel Hector & Davis, Miami, FL, for Defendants.

## ORDER

MARCUS, District Judge.

THIS CAUSE comes before the Court upon the following motions: (1) Defendant Tae Il Media's Emergency Motion for Pre-Judgment Replevin, Attachment and/or Preliminary Injunction and Order to Show Cause, filed December 5, 1995; (2) Defendants Tae Il USA, Techmedia and Otomation's Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint, filed January 16, 1996; (3) Defendants Tae Il USA, Techmedia, Otomation and Park's Rule 56 Motion for Summary Judgment Dismissing Plaintiff's Complaint, filed January 16, 1996; (4) Defendant Park's Rule 12(b)(6) Motion to Dismiss Complaint, filed January 16, 1996; and (5) Defendants Tae Il USA, Techmedia, Otomation and Park's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction, filed January 16, 1996.

After a thorough review of the record and pleadings, and having considered the argument of counsel, Defendant Tae Il Media's emergency motion for pre-judgment replevin, attachment and/or preliminary injunction and order to show cause must be and is DENIED. Defendants Tae Il USA, Techmedia and Otomation's motion to dismiss for lack of personal jurisdiction is GRANTED as to Defendant Tae Il USA, and the Plaintiff's complaint is DISMISSED as to this Defendant. The motion is DENIED as to the other Defendants. Defendants Tae Il USA, Techmedia and Otomation Rule 12(b)(6) motion to dismiss, Tae Il USA, Techmedia, Otomation and Park's Rule 56 motion for summary judgment and Park's motion to dismiss are all GRANTED IN PART and DENIED IN PART. The Plaintiff's breach of contract claims in Counts I, III, IV and IX are DISMISSED to the extent that they concern these Defendants. In all other respects, the motions to dismiss and motions for summary judgment are DENIED.

### I.

Plaintiff Future Tech International, Inc. filed this diversity action on November 13, 1995 against Defendants Tae Il Media, Ltd., Tae Il USA, Inc., Tech Media Computer Systems, Inc. ("Techmedia"), Otomation Engineering, Inc. and Andrew Park. Future Tech, a buyer/distributor of computer equipment, alleges among other things that the Defendants, manufacturers of computer equipment, have engaged in conduct designed to usurp its Latin American distribution network. The complaint alleges breach of contract (Count I), fraud in the inducement (Count II), breach of purchase orders by failing to deliver product and late deliveries (Count III), breach of contract and warranty (Count IV), tortious interference with business relationships (Count V), theft of trade secret (Count VI), breach of fiduciary duty (Count VII), bad checks (Count VIII), breach of contract (Count IX) and trade dress infringement (Count X). As relief, Future Tech seeks $100,000,000.00 in compensatory damages and an additional $100,000,000.00 in punitive damages, plus costs and interest.

The allegations in the complaint can be summarized as follows. Future Tech was established in 1988, and thereafter entered the Latin American market as a distributor of Samsung monitors and other computer products. In 1993, Future Tech determined that brand loyalty was important, and that it would offer its own brand of computer products in order to strengthen market share. In view of previous problems regarding Samsung, which allegedly interfered with Future Tech's distribution channel by attempting to sell its products directly to customers in Latin America, Future Tech insisted that companies manufacturing products for its new brand (MarkVision) promise not to interfere with its network of customers.

In the summer of 1994, according to the Plaintiff, it agreed with Defendant Tae Il Media, Ltd. that Tae Il Media would be the sole manufacturer of monitors and computer systems for its MarkVision brand. Tae Il Media also committed to maintain a $5 million dollar line of credit. Future Tech now asserts that the Defendants (all of whom are associated with Tae Il Media, Ltd.) "never intended to live up to any contract or promise [and instead] intended to put a strangle hold on [Future Tech] and [its] plan to build the MarkVision name by aggressively developing branded loyalty to Defendants' own brand, Tech Media." *Id.* at ¶ 28. Plaintiff insists that the Defendants (1) withheld products and falsely promised a catch-up schedule; (2) took orders knowing they could not deliver the products; (3) provided Tech Media branded products for MarkVision products; (4) solicited Future Tech's customers; (5) delayed the delivery of MarkVision products, creating a need on the part of Future Tech customers and facilitating their secret competition with the Plaintiff; and (6) used Future Tech's "motherboards, cases, and bezels" in their own systems, creating customer confusion. *Id.* Plaintiff also alleges that it agreed with Defendants as early as June, 1994 that, in order to avoid customer confusion, no other monitors or systems produced by Tae Il Media would be distributed in Latin America, and Future Tech would be given certain trade appearance and price protections.

More specifically, Future Tech maintains that untimely shipments emerged as a problem from the very outset of the parties' relationship, with the first shipping delay announced in writing by the Defendants on July 14, 1994. Plaintiff adds that problems relating to exclusivity began by late November, 1994. A meeting was held in Korea in December, 1994, after which Future Tech allegedly received new assurances relating to exclusivity and price protection. In January and February, 1995, Plaintiff says that the Defendants provided additional assurances to address continuing problems regarding exclusivity and price protection. During this time, the Defendants represented to Future Tech that its products would have the lowest prices in South America, and also assured Plaintiff that they were "not interested in interfering in the South American market.... In no circumstances will Tech Media knowingly sell our products for direct sales to the South American Market." *Id.* at ¶ 52.

Further problems relating to price protection and delays in filling orders took place between February and July of 1995, although additional promises and assurances were made during this time. At one point in March, 1995, Future Tech felt compelled to re-label and re-box products of Defendant Techmedia in order to alleviate delays in the delivery of its Mark Vision products. In July, 1995, the parties reached still another agreement addressing issues of price and exclusivity. Nevertheless, Plaintiff submits that it learned that Tae Il Media was breaching the agreement "literally as the ink was drying," and that Tae Il Media "never had any intent to perform." *Id.* at ¶ 79. In particular, Future Tech alleges that it learned Tae Il Media "had sent several containers of its products direct[ly] into South America, promoting its brand over that of Plaintiff, including motherboards and bezels, while withholding shipments of MarkVision branded products. [Tae Il Media] sold their products using Future Tech International's motherboard and case bezels to pawn those 'covered over' motherboards and pawning off specifically designed products owned by Future Tech International as its own." *Id.* Plaintiff alleges that Defendants' secret sales

in Latin America enabled them, as of October, 1995, to sever their relationship with Future Tech, and permitted Tae Il Media to repudiate its contracts with the Plaintiff in favor of establishing its own Techmedia distribution channel in Latin America.

Tae Il Media responded to Future Tech's complaint by filing an answer and counterclaim.[1] Tae Il Media takes the position that the Court does not have personal jurisdiction over it. It adds, however, that to the extent that this Court exercises personal jurisdiction, then Tae Il Media must seek relief of its own against Future Tech. Answer of Def. Tae Il Media, at ¶ 34. Tae Il Media says that since approximately 1983, it has been in the business of manufacturing and distributing computer equipment under the Techmedia name, and that it also operates as an original equipment manufacturer ("OEM"), making products to specification for buyers. Tae Il Media says that it has developed its Techmedia brand to be distinct from the unbranded OEM product that it sells to buyers like Future Tech. According to Tae Il Media, it began delivering OEM equipment to Future Tech in May, 1994, but thereafter Future Tech "regularly made belated and partial payments on the Tae Il Media invoices." Id. at ¶ 48. This Defendant further alleges that Future Tech sold Tae Il Media's Techmedia equipment by removing the trademark without its permission and mislabeling the same as "MarkVision." Id. at ¶ 49. Tae Il Media says that the relabeling of the product was a false representation which had a misleading and deceptive effect on customers. In addition, Tae Il Media says that Future Tech failed to make payments and is now past due on its invoices. The counterclaim alleges breach of contract (count I), action for price (Count II), action for replevin (count III), action for attachment (Count IV), and federal statutory unfair competition (Count V), and seeks damages based on over $16,000,000 of equipment allegedly manufactured and sold to Future Tech.

The parties appeared before this Court for a status conferences on April 29, 1996, at which time the Court took argument on the various pending motions.

## II.

Defendant Tae Il Media has moved for pre-judgment replevin, attachment and/or preliminary injunction, or an Order to show cause why this relief should not be provided pursuant to Fed.R.Civ.P. 64. Future Tech responded on December 19, 1995, and Tae Il Media replied on January 2, 1996. With this application, Tae Il Media seeks: (1) the issuance of a pre-judgment writ of replevin or attachment; and (2) the issuance of a temporary and preliminary injunction concerning shipping containers of computer equipment worth somewhere between $7,000,000.00 and $16,384,810.00, presently in the possession of Future Tech, and/or its ocean carrier and/or bailee.[2] As noted above, Tae Il Media contends that since August 1995, it has manufactured, sold and delivered to Future Tech's freight forwarder and ocean carrier, Maersk Lines, equipment covered by invoices totaling some $16 million dollars. The shipments were made F.O.B. Pusan, Korea and the payment terms were "net 90 days." Tae Il Media argues that, as of November 26, 1995, Future Tech was past due on the invoices to the extent of $3,808.528.00 of the $16,384,-810.00. Due to this asserted failure to pay invoices, and in view of the Future Tech's commencement of this lawsuit, Tae Il Media deemed itself insecure as to Future Tech's

---

1. Defendants Tae Il USA, Techmedia, Otomation and Andrew Park responded to the complaint by filing dispositive motions, which are discussed in this Order.

2. At the status conference on April 29, 1996, counsel for Plaintiff represented that the only property received from Tae Il Media that remains in the Southern District of Florida are within two containers that currently are being held by Maersk Lines. These containers have not yet been forwarded to Future Tech's place of business. Thus, the instant application for prejudg-

ment remedies, according to counsel's representation, only concerns the two containers held by Maersk Lines.

During the status conference, the Court queried both sides as to whether they desired to add any additional evidence to the record underlying this motion. Counsel for Tae Il Media represented that he would stand on the current record from an evidentiary standpoint, and did not seek a further hearing, believing that Tae Il Media was entitled to relief based on the evidence already before the Court.

willingness to meet its contractual obligations, and exercised its rights under Fla. Stat. § 672.609 to demand adequate assurances of Plaintiff's future performance. Not having received the sought-after assurances, Tae Il Media says it properly exercised its right under Fla.Stat. § 672.705 to stop delivery of the containers in transit, and direct the carrier to deliver the equipment back to it. Tae Il Media now indicates that Future Tech is threatening to take possession of the Maersk Lines containers, even though it has failed to pay for the equipment. Based on these facts and circumstances, Tae Il Media maintains that injunctive relief pending a hearing on its application for prejudgment remedies of a writ of replevin or a writ of attachment is warranted, and additionally contends that the underlying application for the prejudgment remedies is appropriate. In response, Future Tech asserts that Tae Il Media has not made a sufficient showing for the relief that it seeks.

### A. *Tae Il Media's Application for a Writ of Replevin*

Defendant Tae Il Media seeks a writ of replevin under Florida law to recover items of computer equipment that it claims it is entitled to possess.[3] Count III of Tae Il Media's Counterclaim alleges the following:

### *Count III*
### (Action for Replevin)

. . . . .

68. This is an action to recover possession of personal property in the Southern District of Florida, described as all Tae Il Media Equipment (the "Equipment") in possession of Future Tech and/or its carrier and/or its bailee.

69. To the best of Tae Il Media's knowledge, information and belief, the price of the Equipment equals or exceeds approximately $7,000,000.00, and includes Equipment in the process of being delivered and any Equipment already delivered to Fu-

ture Tech which has not yet been disposed of by Future Tech.

70. Tae Il Media has made demand on Future Tech for the return of the Equipment to no avail and has made demand on the carrier to stop delivery to Future Tech and to redeliver the Equipment to Tae Il Media.

71. Tae Il Media is entitled to possession of the Equipment based upon, including without limitation, Tae Il Media's proprietary interest as manufacturer and seller of the Equipment, Future Tech's breach of its contract with Tae Il Media by its failure to pay past due invoices as agreed, and Future Tech's failure to provide Tae Il Media with adequate assurance when demanded by Tae Il Media.

72. To the best of Tae Il Media's knowledge, information and belief, the Equipment is located at the Port of Miami in possession of the freight forwarder Mercantile Logistics, Inc. and/or the ocean carrier Maersk Line or at Future Tech's facilities within the Southern District of Florida.

73. The equipment is being wrongfully detained by Future Tech and Future Tech has engaged in or about to engage in conduct that may place the computer equipment, in whole or in part, in danger of concealment, waste, removal from the state, removal from the jurisdiction of the Court, or transfer to an innocent purchaser during the pendency of this action.

74. The Equipment has not been taken for a tax, assessment of fine, nor under execution or attachment against the Equipment or property of Tae Il Media.

C'claim, at ¶¶ 67–74. In support of its application for the writ, Defendant Tae Il Media has submitted a declaration from Byungil Park, the directing manager of the Overseas Sales Department of Tae Il Media. Park attests, in pertinent part, as follows:

2. This declaration is submitted at the request of Tae Il Media in support of its

---

3. According to Tae Il Media, Florida law controls this replevin issue pursuant to Fed.R.Civ.P. 64. Future Tech argues that the Florida replevin statute is inapplicable here, because maritime law applies. Because we conclude that the De-

fendant has not made a sufficient showing for relief under the Florida statute, we need not decide whether maritime law preempts the application of the statute to these facts.

**1546**

Emergency Motion for Replevin and Other Temporary Relief regarding approximately US$7,000,000.00 of containers of computer equipment shipped by Tae Il Media to Future Tech International, Inc. ("Future Tech"). All or a large part of these containers of computer equipment are currently in possession of Future Tech, or Maersk Lines, an ocean carrier, and/or Mercantile Logistics, Inc., bailee. Tae Il Media seeks to stop delivery of this equipment to Future Tech and to return to any equipment in Future Tech's possession which has not been sold to third parties, based upon Tae Il Media's proprietary interest as manufacturer and seller of the equipment, Future Tech's breach of its contract with Tae Il Media by its failure to pay approximately US$3.8 million in past due invoices as agreed, and Future Tech's failure to provide Tae Il Media with adequate assurance when demanded by Tae Il Media.

. . . . .

4. Since August 1995, Tae Il Media has manufactured and delivered to Future Tech's freight forwarder and ocean carrier computer equipment and mailed invoices totaling $16,384,810.00. These shipments were made F.O.B. Pusan, Korea, and the payment terms were "net 90 days." Attached to this declaration as Exhibit "A" is a summary of Tae Il Media's shipments, sales and invoices to Future Tech.

5. As of November 26, 1995, Future Tech is past due on Tae Il Media invoices in the amount of US$3,808,528.00, of the total $16,384,810.00, for computer equipment Tae Il Media sold and delivered to Future Tech. Attached to this declaration as Exhibit "B" is a summary of Future Tech's past due status which shows the invoice number and amount, model and quantity of equipment shipped, the price of the equipment shipped, the due date and the payment status. Future Tech has failed to pay these invoices as agreed. Tae Il Media has demanded payment from Future Tech of these invoices but Future Tech has not made payment to Tae Il Media as demanded.

. . . . .

10. In disregard of Tae Il Media's directions to Future Tech, the carrier and/or bailee, and Tae Il Media's proprietary interest as seller, Future Tech is threatening to take possession of the containers of computer equipment from the carrier and bailee, even though Future Tech failed to pay for the equipment. The carrier and bailee is threatening to deliver the equipment based on Future Tech's presentment of bills of lading and tender of the freight charges. To the best of Tae Il Media's knowledge, information and belief, the invoice price of the Equipment in possession of Future Tech, the carrier and/or bailee is approximately $7,000,000.00. I have written Maersk Line and Mercantile Logistics and have asked for the number of containers in their possession, but have not been given that information. Based upon delivering dates, it is my belief that of the containers of computer equipment delivered by Tae Il Media to Future Tech's carrier priced in excess of $16 million, approximately $7 million is in transit, or in the carriers' storage facilities, and the balance of approximately $9 million has already been delivered by the carrier to Future Tech.

. . . .

12. Tae Il Media is entitled to possession of the computer equipment based upon, including without limitation, Tae Il Media's interest as manufacturer and seller of the computer equipment, Future Tech's breach of its contact with Tae Il Media by its failure to pay past due invoices as agreed, and Future Tech's failure to provide Tae Il Media with adequate assurance when demanded by Tae Il Media.

13. To the best of Tae Il Media's knowledge, information and belief, the computer equipment is located at Future Tech's facilities in Dade County, Florida and/or the Port of Miami in possession of the freight forwarder Mercantile Logistics, Inc. and/or the ocean carrier Maersk Line.

14. The Computer equipment is being wrongfully detained by Future Tech and the carrier and/or bailee and Future Tech has engaged in or is about to engage in

conduct that may place the computer equipment, in whole or in part, in danger of concealment, waste, removal from the state, removal from the jurisdiction of the Court, or sale by Future Tech to an innocent purchaser during the pendency of the action.

Def.Emerg.Mot., Dec. of Byungil Park, at ¶¶ 2, 4, 5, 10, 12–14.

Future Tech has submitted a declaration from Marcel Crespo, its Vice–President of Purchasing, in opposition to Tae Il Media's motion:

8. By agreement of the parties, the terms of the sale were open account, F.O.B. Busan, Korea, net ninety (90) days. Tae Il Media agreed to manufacture and deliver to the carrier selected by Future Tech, Maersk Line, Future Tech's cargo consisting of MARKVISION monitors and MARKVISION computer systems and peripherals designed by Future Tech. Thereafter, Mercantile, on behalf of Future Tech, booked the cargo on Maersk Line vessels, the carrier selected by Future Tech. See Declaration of Ms. Jennifer Seijas, Comptroller, Future Tech International, attached hereto as exhibit "A."

. . . . .

10. Based upon Tae Il[ ] Media's agreement to sell F.O.B. Korea, and as admitted by Tae Il Media in its Motion, Mercantile, a freight forwarder selected by Future Tech agreed to act as shippers agent for Future Tech International and agreed to arrange, book, and otherwise prepare the required documentation for the transportation of Future Tech's cargo with Maersk Line.

11. At all times relevant to Future Tech's shipment of its cargo, Mercantile arranged, booked, and otherwise prepared bills of lading at the instructions of Future Tech. After receiving delivery of MARKVISION monitors and computer systems from the manufacturer, Tae Il Media, Maersk Line would then issue either a straight or order bill of lading naming either Future Tech as the shipper or consignee on a straight bill and to "order of Future Tech" on an order bill. On some bills of lading Future Tech's customers appears as the consignee, or

Mercantile appears as agent for the shipper, Future Tech.

. . . . .

13. Future Tech also purchased marine insurance for all of its shipments originating at [P]usan, Korea and destined to either Miami, Florida, Long Beach, California, or various destinations in Latin America. Future Tech insured its cargo because the terms of sale were F.O.B. Korea and I understand that under this shipping term, risk of loss passed to Future Tech once the goods were delivered to the carrier and loaded on the vessel. Insurance was important to secure payment in the event of loss, damage, or destruction of Future Tech's monitors and computer systems.

14. At all times, Future Tech acted as the lawful shipper for its cargo and as such assumed risk of loss and control of the routing and direction of its cargo to ultimate destination in Latin America based on its customers' need and demand.

. . . . .

32. I have read the Declaration of Mr. Park and it appears that he has not properly described the shipments he seeks possession of by reference to any bills of lading number, date of shipment, ultimate destination, and name of shipper or consignee. In his Declaration, Mr. Park only refers to the "return of any equipment in Future Tech's possession which has not been sold to third parties. . . ." Park [aff.], ¶ 2, page 2.

*Notice of Filing Dec. of Marcel Crespo,* December 19, 1995, at ¶¶ 8, 10, 11, 13, 14, 32.

Under Florida law, replevin is a legal action to obtain the recovery of property and/or damages for the wrongful detention of the property. *See Delco Light Co. v. John Le Roy Hutchinson Properties,* 99 Fla. 410, 128 So. 831, 835 (1930). In order to secure replevin relief, "the plaintiff must show a right of possession in himself. He must show that he was entitled to the possession of the property when the action was brought. . . . The gist of the action is not the taking of the property, but rather the wrongful detention

of it and the plaintiff's right to immediate possession." *Id.* This common law formulation has been incorporated into a Florida statute, which provides that:

Any person whose personal property is wrongfully detained by any other person or officer may have a writ of replevin to recover said personal property and any damages sustained by reason of the wrongful taking or detention as herein provided.

Fla.Stat. § 78.01. Pursuant to the statute, a prejudgment writ of replevin requires the recitation of the following information:

(1) A description of the claimed property that is sufficient to make possible its identification and a statement, to the best knowledge, information, and belief of the plaintiff of the value of such property and its location.

(2) A statement that the plaintiff is the owner of the claimed property or is entitled to possession of it, describing the source of such title or right. If the plaintiff's interest in such property is based on a written instrument, a copy of said instrument must be attached to the complaint.

(3) A statement that the property is wrongfully detained by the defendant, the means by which the defendant came into possession thereof, and the cause of such detention according to the best knowledge, information and belief of the plaintiff.

(4) A statement that the claimed property has not been taken for a tax, assessment, or fine pursuant to law.

(5) A statement that the property has not been taken under an execution or attachment against the property of the plaintiff or, if so taken, that it is by law exempt from such taking, setting forth a reference to the exemption law relied upon.

Fla.Stat. § 78.055. Moreover, a prejudgment writ of replevin:

(1) ... may be issued and the property seized delivered forthwith to the petitioners when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from the specific facts shown by verified petition, or by separate affidavit of the petitioner.

(2) This prejudgment writ of replevin may issue if the court finds, pursuant to subsection (1), that the defendant is engaging in, or is about to engage in, conduct that may place the claimed property in danger of destruction, concealment, waste, removal from the state, removal from the jurisdiction of the court, or transfer to an innocent purchaser during the pendency of the action or that the defendant has failed to make payment as agreed.

Fla.Stat. § 78.068. In determining whether a writ of replevin should issue, the Court must:

consider the affidavits and other showings made by the parties appearing and make a determination of which party, with reasonable probability, is entitled to the possession of the claimed property pending final adjudication of the claims by the parties. This determination shall be based on a finding as to the probable validity of the underlying claim alleged against the defendant. If the court determines that the plaintiff is entitled to take possession of the claimed property, it shall issue an order directing to clerk of the court to issue a writ of replevin. However, the order shall be stayed pending final adjudication of the claims of the parties if the defendant files with the court a written undertaking executed by a surety approved by the court in an amount equal to the value of the property.

Fla.Stat. § 78.067.

It is important to underscore that an action for replevin "is not brought, like the action of assumpsit, for example, for the purpose of recovering the amount which might be found to be due from the defendant to the plaintiff on account, but to recover the property in dispute." *Johnson v. Clutter Music House,* 55 Fla. 385, 46 So. 1, 2 (1908). Again, in a replevin proceeding, "the main issue is the right of possession." *Sandy Isles of Miami, Inc. v. Futernick,* 154 So.2d 355 (Fla.3d Dist.Ct.App.1963). A corollary of the general theory of the replevin action is that:

[t]he plaintiff's choice of remedies is of importance, for he may waive his right to the property by seeking a remedy that affirms title and right to possession of the

property in another, as, for instance, *where he sues the vendee for the purchase price.*

*Coronet Kitchens, Inc. v. Mortgage Mart, Inc.,* 146 So.2d 768, 769 (Fla.2d Dist.Ct.App. 1962) (emphasis added).

■ We are not persuaded that, on this record, Tae Il Media has met its burden of establishing its right to replevy of the two containers currently held by Maersk Lines. To begin with, Tae Il Media has failed to demonstrate to a reasonable probability that it is "the owner of the claimed property or is entitled to possession of it." *Id.* The record makes clear that Future Tech, not Tae Il Media, has title to the computer equipment in the containers. The parties seem to agree that the goods in question were sold on the terms F.O.B. Pusan, Korea and "net 90 days." In other words, "delivery" to Future Tech occurred not in Miami, but in Pusan, where title and the risk of loss passed to Future Tech. Thus, although the goods were—and continue to be—in the possession of Future Tech's shipper, Future Tech has had lawful title to the equipment since delivery at Pusan. *See, e.g., Charia v. Cigarette Racing Team, Inc.,* 583 F.2d 184, 188 (5th Cir.1978) (stating that "[s]hipment 'FOB Florida' simply means that title to the goods and the risk of their loss passed to Charia in Florida, and Charia bore the cost of shipping from Florida to Louisiana"); *Jacobson v. Neuensorger Korbwaren–Indus. F.K., K.–G.,* 109 So.2d 612, 614 (Fla. 3d Dist.Ct.App.1959) (stating that "[t]he provision of the contract for sale of the merchandise stating the price and providing 'f.o.b. Hamburg order Bremen' resulted in title to the goods passing to the purchaser at that point of shipment (Hamburg).... From that point, and during the balance of the journey, the risk of loss was on the purchaser.") (citations omitted).[4] It is noteworthy that Park's affidavit never suggests that Future Tech, the consignee on the bills of lading and the insurer of the goods, does not have title to the equipment. Moreover, the fact that actual delivery of the equipment to Future Tech has not yet been effected by Maersk Lines is of no moment to our analysis.

■ The law in Florida is clear that a writ of replevin may only issue against specific property as to which a claimant has a possessory right. In *Prestige Rent–A–Car v. Advantage Car Rental and Sales,* 656 So.2d 541 (Fla. 5th Dist.Ct.App.1995), for example, the court found a right to possession for purposes of a replevin action where the parties' lease agreement gave the moving party the *express* right to possession upon default under the contract. *Id.* at 545. Similarly, in *Morse Operations, Inc. v. Superior Rent–A–Car, Inc.,* 593 So.2d 1079 (Fla. 5th Dist.Ct. App.1992)—a case which, according to Tae Il Media, is on point—the right to possession was found to be demonstrated to a reasonable probability not only because the non-moving party breached the parties' lease agreement, but also because a bankruptcy court order formally "empowered [Morse] to replevy the cars" from the non-moving party. *Id.* at 1080–81. But Tae Il Media has not called our attention to *any* provision in its contract(s) with Future Tech that affords it an express right to retake possession of the computer equipment, once title has passed, upon a showing that Future Tech is in complete or partial default. *See, e.g., Medina v. Star Holding Co. No. 1., Inc.,* 588 So.2d 1032 (Fla. 3d Dist.Ct.App.1991) (awarding prejudgment writ of replevin against stock certificates owned by the defendant, where the issuer established that it was entitled to possession of the certificates under a pledge agreement between the parties); *compare McMurrain v. Fason,* 573 So.2d 915 (Fla. 1st Dist. Ct App.1990) (dissolving writ where the parties' agreement for operation of a computer store did not authorize the franchisor "to take possession, immediately or otherwise," of the franchisee's inventory upon the occurrence of the events alleged in the franchisor's complaint). Nor has Tae Il Media called our attention to another legal authority, such as a bankruptcy court order, affording it a right of immediate possession.

---

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Tae Il Media nevertheless suggests that a seller may obtain a writ of replevin over goods sold to a buyer upon the mere showing that the buyer has not paid for the goods, even though title to the goods has passed to the buyer and no right of possession has been shown. As support for this proposition, the Defendant cites, among other cases, *Transtar Corporation v. Intex Recreation Corp.*, 570 So.2d 366 (Fla. 4th Dist.Ct.App. 1990) and *Landmark First National Bank v. Beach Bait and Tackle Shop, Inc.*, 449 So.2d 1287 (Fla. 4th Dist.Ct.App.1983). We do not agree that these cases establish the principle for which they are cited. In *Transtar,* the plaintiff obtained a writ of replevin over certain goods sold to the defendant. The defendant moved to dissolve the writ. The trial court denied relief, after which the defendant appealed. The Fourth District Court of Appeals affirmed the trial court's ruling in a terse opinion that reads as follows:

> After appellant purchased certain goods from appellee but failed to pay, appellee successfully sought replevin of the goods. The trial court denied appellant's Motion to Dissolve Prejudgment Writ of Replevin. It is appellant's position on appeal that replevin does not lie in the absence of a security interest or other independent possessory interest in the goods sought to be replevied. This is clearly wrong. The applicable statute is section 78.068, Florida Statutes (1989), which authorizes the issuance of a pre-judgment writ of replevin where "the defendant has failed to make payment as agreed." We have previously applied this statute in accordance with the position taken by appellee in this case. Accordingly, we affirm.

570 So.2d at 367 (citations omitted). *Transtar* does not contain any discussion of the terms of the parties' contract of sale, or otherwise shed light on the circumstances surrounding the transaction at issue.[5] Absent this information, it is difficult to read the opinion as anything more than a straight-forward confirmation of the fact that a buyer's failure to pay for goods is one of the conditions identified in section 78.068(2) as a possible trigger for prejudgment replevin.

The effect of reading the case otherwise would be curious indeed. Section 78.068(2) sets forth some of the conditions upon which a writ of replevin may be issued, including the removal of property from the jurisdiction, threatened transfer to innocent purchasers and failure to pay as agreed. However, nothing in this section contradicts other parts of the replevin scheme, which require the court to *first* determine to a reasonable probability who has a lawful right to possession of the property. Fla.Stat. § 78.055(2); *see also Ethiopian Zion Coptic Church v. City of Miami Beach,* 376 So.2d 925, 926 (Fla. 3d Dist.Ct.App.1979) (dismissing replevin claim brought to recover marijuana plants seized from church because the plants were contraband and the church had no right to possess them, and adding that "the main issue [in a replevin action] is the right to immediate possession"). Put another way, a court need only reach the question of right to possession if one of the conditions in Fla.Stat. § 78.068(2) is shown, but that is altogether different than saying that a right to possession need not even be shown, and that satisfaction of the conditions in Fla.Stat. § 78.068(2) is in and of itself sufficient for the issuance of a writ of replevin. To accept this theory would be to stand the replevin statutory scheme on its head.

For similar reasons, the Defendant's reliance on *Landmark* is unpersuasive. In that case, the Fourth District Court of Appeal discussed the power of a trial judge to dissolve a writ of replevin even though the movant establishes the "failure to pay" condition. As in *Transtar,* however, the *Landmark* panel did not lay out the facts of the case before it, which makes it impossible for us to discern whether the Court was in fact doing away with the threshold statutory requirement that the petitioner prove his right to possess the property to be replevied. Neither of these cases expressly holds that a seller may obtain replevin of goods even though lawful title and actual possession of the goods are with the buyer. Under the facts and circumstances of this lawsuit, we accord little weight to these opinions, and instead follow the plain and unambiguous

5. Nor do the supplemental materials that the parties have submitted on this case.

language of the statute, as reflected in cases like *Prestige Rent–A–Car* and *McMurrain.*

But even assuming arguendo that *Transtar* stands for the sweeping proposition that the Defendant asserts, and in so doing properly states the law of Florida, the reasoning of that case is unhelpful to Tae Il Media, because it has failed to prove with particularity that the items it seeks to replevy—the two containers retained by Maersk Lines—hold the specific items of computer equipment as to which Future Tech is in default. If nothing else, *Transtar* presupposes that the seller can establish a clear and unmistakable nexus between the debt and the specific goods to be replevied. At best, the pleadings and declarations submitted in support of Tae Il Media's application reveal that (1) the Maersk Lines containers hold products that have been shipped to Future Tech from Tae Il Media; and (2) Future Tech may not be current on its accounts with Tae Il Media. *Nothing* in the record establishes that any, let alone all, of the specific items in the containers are the items for which payment allegedly has not been made. Absent this particularized showing, the issuance of a writ of replevin would be improper. Tae Il Media cites nothing to establish that a seller may obtain replevin of a buyer's entire warehouse of purchased goods upon the mere showing that the buyer may be delinquent in some of his accounts as to some of the products sold.

At all events, we stress that a seller who claims that a buyer has failed to pay for certain products has ample vehicles, other than an action for replevin, to obtain satisfactory relief. To the extent that the goods are unique or perishable, the buyer may move for entry of an injunction. To the extent that the goods are ordinary, the remedy is money damages, to be obtained through an action for breach of contract. For this reason, the Florida courts have recognized that a party pleading a contract cause of action essentially concedes that it does not have a possessory right to the goods in dispute, and therefore is not entitled to seek replevin. *See Coronet Kitchens,* 146 So.2d at 769. Here, Tae Il Media can, and indeed has, asserted a cause of action to recover the price of the equipment it sold and for which it has not been paid. Count II of the Defendant's counterclaim, entitled "Action for Price," alleges in pertinent part:

65. Tae Il Media manufactured, sold and delivered equipment to Future Tech.

66. Future Tech failed to pay Tae Il Media the price of the equipment as it became due, thereby entitling Tae Il Media to recover from Future Tech damages in the principal amount of the price of the equipment, incidental damages incurred in shipping delivery, and in the transportation, care and custody of the goods in connection with the return or resale of the equipment under Florida Statute § 672.710, prejudgment interest, court costs and attorney's fees pursuant to the Agreement between the parties.

C'claim, at ¶¶ 65–66. The pleading of this cause of action, which is arguably available on these facts, is inconsistent with the asserted right to replevin. While alternate theories of relief undoubtedly may be pleaded under the Federal Rules, Florida case law suggests that a contract claim like Count II may defeat a co-extensive claim for replevin. *See Coronet Kitchens,* 146 So.2d at 769 (stating that "[t]he plaintiff's choice of remedies is of importance, for he may waive his right to the property by seeking a remedy that affirms title and right to possession of the property in another, as, for instance, where he sues the vendee for the purchase price").

█ In short, there is nothing on this record to establish that there is a "reasonable probability" that Tae Il Media is entitled to possession of the equipment held in the two containers located in this District. Even assuming that Tae Il Media manufactured and sold the equipment, and assuming further that Future Tech has not paid the balance of the outstanding invoices, these facts, standing alone, do not confer on Tae Il Media an immediate right to possess the equipment. The statutory requirements have not been met on this record, and accordingly the prejudgment remedy of replevin is unwarranted.[6] In light of this holding, we need not

---

**6.** We note further that Tae Il Media has not

established its compliance or intent to comply

discuss whether principles of set-off or other defenses preclude Tae Il Media from obtaining replevin.

### B. *Tae Il Media's Application for Injunctive Relief*

Defendant Tae Il Media next seeks injunctive relief "directing Future Tech and its carrier to not deliver possession of the containers of computer equipment to any third party, thereby maintaining the status quo." Def.Emerg.Mot., at 4. Defendant Tae Il Media suggests that a limited injunction over a discrete res, the computer equipment for which it seeks replevin and attachment, is warranted under the circumstances. We are not persuaded.

In *Rey v. Guy Gannett Publishing Co.,* 766 F.Supp. 1142 (S.D.Fla.1991), this Court set forth the governing law as to the propriety of injunctive relief:

> It is undisputed that under federal law in this Circuit Plaintiffs must prove four elements to obtain a preliminary injunction. Pursuant to Fed.R.Civ.P. 65, a district court is reposed with discretionary power to grant preliminary injunctive relief. *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 332 (5th Cir.1981). In exercising its discretion, however, the court must evaluate and balance four recognized prerequisites to preliminary injunctive relief: (1) a substantial likelihood that the movant will prevail on the underlying merits of the case; (2) a substantial threats that the moving party will suffer irreparable damage if relief is denied; (3) a finding that the threatened injury to the movant outweighs the harm the injunction may cause defendant; and (4) a finding that the entry of a preliminary injunction would not disserve the public interest. *Tally–Ho, Inc. v. Coast Community College District,* 889 F.2d 1018, 1022 (11th Cir.1989). It is also well-established in this Circuit that Plaintiffs bear the burden of persuasion on all four preliminary injunctive standards. *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983).
>
> Moreover, in exercising its discretion, a court is guided by established rules and principles of equity jurisprudence. *Muss v. City of Miami Beach,* 312 So.2d 553, 554 (Fla. 3d Dist Ct.App.), *cert. denied,* 321 So.2d 553 (Fla.1975). And we are reminded that "a preliminary injunction is an extraordinary and drastic remedy; it the exception and not the rule." *Canal Authority v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974).

*Id.* at 1145–46.

█ Defendant's application, which in essence seeks a freeze on the equipment contained in the two containers with Maersk Lines, lacks a sufficient foundation, at least on this record.[7] To begin with, Tae Il Media

with one of apparent statutory prerequisites to a prejudgment writ of replevin. Section 78.068(3) explains that, in order to obtain the writ, the petitioner "must post bond in twice the value of the goods subject to the writ ... as security for the payment of damages the defendant may sustain when the writ is obtained wrongfully." This requirement ensures that the drastic remedy of replevin will not be pursued lightly. Tae Il Media suggests that a bond need only be posted when the petitioner is proceeding ex parte. We cannot agree. Nothing in the otherwise plain language of section 78.068(3) supports this proposition, and Florida courts repeatedly and unequivocally have confirmed that the posting of a bond is a necessary condition of relief, regardless of the ex parte nature of the action. *See, e.g., Prestige Rent–A–Car,* 656 So.2d at 546; *Unicorn Star, Inc. v. La Corrida Restaurante, Inc.,* 591 So.2d 271, 272 (Fla. 4th Dist.Ct.App.1991); *Vega v. Hughes,* 370 So.2d 1187, 1188 (Fla. 4th Dist. Ct.App.1979). The Defendant cites *T and T Air Charter, Inc. v. Duncan Aircraft Sales, Inc.,* 566 So.2d 361 (Fla. 4th Dist.Ct.App.1990) as holding that no bond must be posted unless the proceeding is ex parte. In *T and T,* the panel stated in dicta that "[s]ection 78.065, Florida statutes (1989), did not require appellee as a party seeking replevin to post a bond. A bond is only required when the defendant in the replevin action wants to stay the order to issue a writ or replevin pending final adjudication." *Id.* at 362. The requirement of bond is not created by section 78.065, however; it appears in section 78.068(3). Against the backdrop of the unambiguous language of the statute and other Florida case law, *T and T,* which does not discuss ex parte proceedings, carries little persuasive weight.

7. The nature of the injunction sought by Tae Il Media is unclear. At times, the Defendant suggests that it only seeks an injunction pending this Court's ruling on the appropriateness of prejudg-

makes no attempt to explain how the four prerequisites to injunctive relief are satisfied here. An injunction, even a limited one over specific items of property, remains an extraordinary remedy. *Id.* Yet Tae Il Media never makes the kind of "extraordinary" showing that might convince the Court to exercise its discretion in favor of imposing an injunction in this case.

■ First of all, Tae Il Media has not demonstrated a substantial likelihood that it will prevail on the underlying merits of its case. As discussed above, the limited record before us does not establish that Tae Il Media has a right to possess the equipment in the containers. Moreover, the evidence in the record is insufficient, at this time, to establish that Tae Il Media will prevail on its counterclaims for recovery of the contract price.

■ Second, Tae Il Media has failed to show that it faces a substantial threat of irreparable damage if injunctive relief is denied. Even viewing the facts in a light most favorable to this Defendant, the harm that would result from Future Tech's alleged wrongful taking of the containers of computer equipment without proper payment could be remedied quite simply and precisely with money damages. Notably, Tae Il Media has not asserted that the computer equipment is not fungible, or that it has some type of special value for which damages could not, at some point in the future, form adequate compensation in the event that it prevails on its claims. Nor has the Defendant established a substantial likelihood that Future Tech will be unable to satisfy a judgment against it. We stress that "[m]ere injuries, however substantial, in terms of money ... are not enough. The possibility of adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 1147–48 (quoting *Jefferson County,* 720 F.2d 1511).

■ Tae Il Media fares no better upon a review of the balance of the hardships. There are multiple reasons supporting Future Tech's view that injunctive relief in this case would harm it far more than the absence of injunctive relief would harm the Defendant. The continued detention of the computer equipment, which is intended for resale to the Plaintiff's customers in Latin America, may irrevocably damage Future Tech's business relationship with its customers. Moreover, even a small time lag in bringing computer products to the market may result is a significant drop in the value of the products, in view of the continually evolving nature of technical knowledge and product development in the computer equipment industry. In short, the balance of hardships does not weigh strongly in Tae Il Media's favor. We note further that Tae Il Media has not explained how the public interest would be served by the issuance of an injunction. Preventing marketable computer products from entering the stream of commerce while permitting them to lose value hardly would be in the public interest, especially since money damages will adequately compensate the Defendant for any improper or unlawful conduct by Future Tech. For all of the foregoing reasons, Tae Il Media has not met its burden of making the extraordinary showing needed to obtain injunctive relief.

C. *Tae Il Media's Application for a Writ of Attachment*

■ Tae Il Media also seeks a writ of attachment based in part on the Plaintiff's "own admissions" that it is removing the disputed computer equipment from the jurisdiction. Florida law provides that:

[A] creditor may have an attachment on a debt actually due to the creditor by his or her debtor, when the debtor:

(1) will fraudulently part with the property before judgment can be obtained against him or her;

ment relief in the form of replevin or attachment. At other times, it seems that Tae Il Media is seeking a freeze on the goods it has delivered to Future Tech (including, but not necessarily limited to, the two Maersk Lines containers), at least

during the pendency of this lawsuit. Because this Order embodies the Court's ruling on the appropriateness of the desired prejudgment remedies, we will assume that Tae Il Media seeks this broader form of injunctive relief.

(2) is actually removing the property out of the state;

(3) is about to remove the property out of the state;

(4) resides out of the state;

(5) is actually moving himself or herself out of the state;

(6) is about to move himself or herself out of the state;

(7) is absconding;

(8) is concealing himself or herself;

(9) is secreting the property;

(10) is fraudulently disposing of the property;

(11) is actually removing himself or herself beyond the limits of the judicial circuit in which he or she resides;

(12) is about to remove himself or herself out of the limits of such judicial circuit.

Fla.Stat. § 76.04. However, "[b]ecause of the extraordinary nature of attachment proceedings, the terms of the statute must be narrowly construed." *Cerna v. Swiss Bank Corp.*, 503 So.2d 1297 (Fla. 3d Dist.Ct.App. 1987).

■ Tae Il Media has not adequately established its compliance with several procedural thresholds to relief. For example, it has not demonstrated that it has supplied a bond in an amount equal to twice the debt, as required by Fla.Stat. § 76.12. *See Frio Ice, S.A. v. SunFruit, Inc.*, 724 F.Supp. 1373, 1379–80 (S.D.Fla.1989), *rev'd on other grounds*, 918 F.2d 154 (11th Cir.1990) (denying request for prejudgment attachment in part because the movant failed to prove compliance with the bond requirement of section 76.12). Moreover, Florida courts have observed that the issuance of prejudgment attachment is "only appropriate in extraordinary circumstances or when legal remedies are shown to be inadequate, and the right to recover is clear." *Cohen v. Hardman*, 416 So.2d 498, 500 (Fla. 5th Dist.Ct.App.1982). Defendant Tae Il Media's showing is quite minimal in this regard. At no point does this Defendant articulate why the extraordinary relief of attachment is required in this case— or, concomitantly, why relief could not be eventually satisfied by the award of money damages after trial.

For all of the foregoing reasons, Defendant Tae Il Media's emergency motion for prejudgment replevin, attachment and/or preliminary injunction and Order to show cause must be denied.

### III.

Defendants Tae Il USA, Techmedia, Otomation and Park have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, arguing that there is no basis for the exercise of long-arm jurisdiction and that the movants lack sufficient minimum contacts with Florida to subject them to this forum consonant with due process. Plaintiff answers that the Court can exercise jurisdiction in accordance with the Florida long-arm statute based on the Defendants' business transactions in Florida, the commission of torts in this State and the breach of contracts in this State. Plaintiff further answers that sufficient minimum contacts exist with Florida to subject the Defendants to the jurisdiction of this Court. Future Tech also notes that Defendant Park may not employ the corporate shield doctrine as an argument against jurisdiction. For the following reasons, we grant the motion to dismiss as to Tae Il USA, but deny it as to the other Defendants.

■ In evaluating personal jurisdiction, we look first at the applicable state statute, and, second, at federal due process requirements. In diversity cases, " 'the federal court is bound by state law concerning the amenability of a person or a corporation to suit, so long as state law does not exceed the limitations imposed by the Due Process Clause of the Fourteenth Amendment.' " *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1521 (11th Cir.1985) (citations omitted).

The law is clear that a federal court in a diversity case may exercise jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state. Because the reach of the Florida long-arm statute is a question of Florida state law, federal courts are requires to construe it as would the Flori-

da Supreme Court. The Florida long-arm statute is strictly construed, and the person invoking jurisdiction under it has the burden of proving facts which clearly justify the use of this method of service of process.

*Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.,* 701 F.2d 889, 890–91 (11th Cir.1983) (citations omitted).

In resolving issues of personal jurisdiction, the Court must make a threshold ruling whether Plaintiffs' complaint alleges sufficient facts to meet the requirement of Florida's long-arm statute. As the Florida Supreme Court explained in *Venetian Salami Co. v. Parthenais,* 554 So.2d 499 (Fla.1989):

> Initially, the plaintiff may seek to obtain jurisdiction over a nonresident defendant by pleading the basis for service in the language of the statute without pleading the supporting facts. By itself, the filing of a motion to dismiss on grounds of lack of jurisdiction over the person does nothing more than raise the legal sufficiency of the pleadings. A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position. The burden is then placed upon the plaintiff to prove by affidavit the basis upon which jurisdiction may be obtained.

> . . . . .

> [Where the affidavits of the parties cannot be reconciled], the trial court will have to hold a limited evidentiary hearing in order to determine the jurisdiction issue.

*Id.* at 502–03 (citations omitted).

The requirements set forth in *Venetian Salami Co.* were explained in more detail by the Fourth District Court of Appeal in *Elmex Corp. v. Atlantic Federal Savings & Loan Ass'n,* 325 So.2d 58 (Fla. 4th Dist.Ct. App.1976) in these terms:

> A defendant seeking to challenge the legal sufficiency of matters alleged in a complaint relating to the application of the long-arm statute may do so by filing a motion to dismiss (or abate) on the ground of lack of jurisdiction over the person. The motion, in essence, must be treated as admitting all facts properly pleaded pertinent to the conduct and activities of the defendant in the forum state and constitutes an assertion that as a matter of law such facts are nevertheless legally insufficient to demonstrate the applicability of the long-arm statute. It may be unnecessary for the defendant to do anything more than file a simple (unsupported) motion where the allegations of the complaint are legally insufficient. However, a complaint may present jurisdictional facts which (when deemed admitted for the purposes of the motion) would be sufficient to withstand such motion. The determination of the motion is based on the … facts reflected in the pleadings or apparent from the face of the record. The court determines whether the facts are sufficient as a matter of law to justify the application of the long-arm statute. A defendant seeking to inject factual matters which do not appear on the face of the record is required to support the motion to dismiss with an affidavit, deposition or other proof. If the supporting proof reflects facts in opposition to or in contravention of those matters contained in the complaint the issue becomes then "one of proof" with the burden shifting to the plaintiff to clearly show by competent proof that the allegations of the complaint justify the application of the long-arm statute. For example where an affidavit is presented, reciting various activities and conduct in which a defendant does *not* engage in the forum state thereby negating or opposing the allegations of fact in the complaint, then the burden shifts to the plaintiff to present by opposing affidavit or other proof those material facts supporting the allegations in the complaint which, as a matter of law, would give rise to a determination that the defendant is "doing business" in the forum state. Competent proof presented by a plaintiff may be evidenced by a sworn affidavit either reciting matters substantially alleged in the complaint or asserting with particularity specific facts which support a general allegation in the complaint.

*Id.* at 61–62. (citations omitted). If the requirements of the state long-arm statute

have been met, the next inquiry is whether Plaintiffs have pled and can demonstrate "minimum contacts" to satisfy constitutional due process requirements. *Venetian Salami Co.,* 554 So.2d at 503.

### A. *Florida Long–Arm Statute*

Initially, we address whether the jurisdictional facts alleged in the complaint fall within the scope of the Florida long-arm statute. Fla.Stat. § 48.193 provides in pertinent part:

**48.193. Acts subjecting person to jurisdiction of courts of state**

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

 (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

 (b) Committing a tortious act within this state.

 . . . . .

 (g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

(2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Fla.Stat. § 48.193(1)(a), (b), (g), (2).

Plaintiff Future Tech contends that the moving Defendants' conduct falls within each of these subsections of the Florida long arm statute. First, Plaintiff argues that the moving Defendants have engaged in substantial and systematic business activity in the State of Florida dating back to mid–1994, conferring general jurisdiction pursuant to section 48.193(2). In support of this argument, Plaintiff submits that Defendants Otomation, Techmedia, Tae Il Media and Park have so-licited Future Tech's competitors in Miami, Florida. This argument is based upon the affidavits of Marcel Crespo, Vice–President of Purchasing for Future Tech, and Louis Leonardo, the President of Future Tech. Aff. of Marcel Crespo, March 4, 1995, ¶ 39; Aff. of Louis Leonardo, March 4, 1995, at ¶ 19. In addition, Future Tech asserts that Park and other representatives of Otomation and Techmedia have traveled to Miami for business relating to the instant case on at least six occasions, and have attended a minimum of three major meetings in Miami with Future Tech, during which the parties negotiated their contractual arrangements and discussed their respective rights under the arrangements. Crespo aff., ¶¶ 7, 13, 37; Leonardo aff., ¶¶ 3, 6, 17. Moreover, Crespo and Leonardo averred that, during these meetings, representatives of Tae Il Media, Techmedia and Otomation were present. *Id.* Furthermore, Crespo and Leonardo state that Otomation, Techmedia and Park have engaged in extensive correspondence, phone conversations and telefaxes with Future Tech in Miami during which numerous material misrepresentations were made. Crespo aff., at ¶¶ 9–14, 20–23, 25–36; Leonardo aff., at ¶¶ 5, 12.

In support of their motion, the moving Defendants submit that Park is a "resident of the State of California and ha[s] resided in California since 1985. I have never resided in Florida, nor do I own or have an interest in any real or personal property in Florida." Appendix to Mem. of Law in Supp. of Defs. Rule 9, Rule 12 and Rule 56 Mot. to Dismiss and for Summ. J'ment, January 19, 1996, Dec. of Andrew Park, at ¶ 3. Defendant Park also attests that there "were numerous substantive negotiations, meetings and discussions between Future Tech and Tae Il Media in Las Vegas, Nevada, Seoul, Korea, New York, New York, and Miami, Florida," but that "[m]y contacts in Florida were minimal and incidental to these numerous discussions that occurred outside of Florida. I attended three meetings in Miami, Florida with Future Tech solely in my capacity as President of Otomation in the summer of 1994 and I met with Future Tech and Tae Il Media persons in February 1994 solely in my

capacity as President of Techmedia." *Id.* at ¶ 17. The moving Defendants further assert that "Techmedia is not registered or authorized to conduct business in Florida," nor does Techmedia maintain offices, own real estate, or have any agents or physical presence in Florida. *Id.* at ¶ 13. Defendants add that while Future Tech did place orders for computer equipment from Techmedia in 1995, "Techmedia's sales to Future Tech were short-term, one-time sales agreements and particular sales and were not part of ongoing or continuing obligations with [ ] Future Tech or negotiations." *Id.* at ¶ 14. Park makes a similar declaration concerning Otomation's lack of authority to conduct business in Florida, as well as its lack of employees or agents, property or a physical presence in the State. *Id.* at ¶ 11. Finally, Park declares that "[n]either I, nor Otomation, nor Techmedia are signatories or parties to the document entitled "Agreement" between Tae Il Media and Future Tech International dated August 10, 1994. Neither I, nor Otomation, nor Techmedia were signatories or parties to the documents dated July 26, 1995, attached as Exhibit 'E' to Mr. Crespo's Declaration. I did not sign that document nor was I present at the meeting where that document was allegedly signed." *Id.* at ¶ 16.

With respect to Defendant Tae Il USA, the moving Defendants offer the declaration of Yoon H. Choo, President of Tae Il USA, who states as follows:

Tae Il USA does not now and never did have any officers, agents or employees located in the State of Florida. Tae Il USA has never had an office in Florida nor has it ever been authorized to conduct business in Florida. Tae Il USA does not own or lease any property in Florida nor does it pay any taxes in Florida. Tae Il USA does not now nor has it ever had a telephone listing in Florida, a mailing address nor has it ever advertised in Florida. Tae Il USA has never transacted business in Florida. Mr. Jung Kyun Bae, the person identified in the Affidavit of Service on Tae Il Media U.S.A., Inc., is not a Managing Director, officer or employee of Tae Il USA.

*Id.* at Dec. of Yoon Choo, ¶ 4. This declarant also states that "Tae Il USA had no dealings and transacted no business with Plaintiff Future Tech. . . . I have searched the business records of Tae Il USA and there are no purchase orders, contracts, invoices or correspondence of any kind between Tae Il USA and Future Tech." *Id.* at ¶ 3.

Having considered this record evidence submitted on the threshold question of personal jurisdiction, we are satisfied that there is a adequate basis to exercise jurisdiction consonant with the Florida long arm statute as to Defendants Techmedia, Otomation and Park. We conclude, however, that the Plaintiff has failed to meet its burden of demonstrating that Defendant Tae Il USA is subject to the jurisdiction of this Court.

 Taking the issue of "general jurisdiction" under Fla.Stat. § 48.193(2) first, it is apparent that Defendants Techmedia, Otomation and Park have "engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise." These Defendants cite a number of cases to support their argument that no systematic contacts exist. *See Oy v. Carnival Cruise Lines, Inc.*, 632 So.2d 724, 726 (Fla. 3d Dist.Ct.App.1994) (holding that court did not have jurisdiction over Finnish manufacturer where, among other things, there was no evidence that it "sent any representatives to Florida"); *Ranger Nationwide, Inc. v. Cook*, 519 So.2d 1087, 1089 (Fla. 3d Dist.Ct.App.1988) (holding that sporadic and isolated uses of Florida roadways did not subject defendant to jurisdiction); *Price v. Point Marine, Inc.*, 610 So.2d 1339, 1342 (Fla. 1st Dist.Ct.App.1992) (holding that "haphazard and sporadic" solicitation or procurement of business insufficient to confer general jurisdiction but noting that "continued or sustained effort to procure business, or actual procurement of business" would be sufficient). Here, however, Defendant Park and other representatives of Techmedia and Otomation met with representatives of Future Tech on multiple occasions in Miami in furtherance of their existing business relationship and in order to procure additional business. This pattern of activity cannot be fairly characterized as spo-

radic or isolated. The trips and business communications, which were spread out over a period of about a year, are "neither incidental nor insignificant" and therefore are sufficient to meet the standard of general jurisdiction under the controlling Florida long arm statute. *See, e.g., Noury v. Vitek Mfg. Co., Inc.*, 730 F.Supp. 1573, 1574–75 (S.D.Fla.1990) (concluding that § 48.193(2) was satisfied where defendant engaged in sales activity for a period of several years, advertised in national publications reaching Florida and attended professional conference in Florida).

■■■ Plaintiff also has demonstrated that specific jurisdiction may be exercised under § 48.193(1)(a), since the record reveals that Park, Otomation and Techmedia have been "operating, conducting, engaging in, or carrying on a business" in Florida. In *Citicorp Ins. Brokers v. J.R. Charman*, 635 So.2d 79 (1st Dist.Ct.App.1994), the First District Court of Appeal noted that "[t]o invoke long-arm jurisdiction over a foreign corporation under section 48.193(1), (2), the activities of the corporation 'must be considered collectively and show a general course of business activity in the state for pecuniary benefits.'" *Id.* at 81 (quoting *Foster, Pepper & Riviera v. Hansard*, 611 So.2d 581, 582 (Fla. 1st Dist Ct.App.1992)). In *Citicorp*, jurisdiction was sustained on the basis of evidence establishing, among other things, that the Defendant sent representatives to Florida on two occasions to solicit business, and sent numerous letters and telefaxes in connection with the business at hand. *Id.* With the exception of Defendant Tae Il USA, there is substantial evidence on the record, entirely reconcilable with the submission of Defendants' declarations, that would support jurisdiction in this case based on the meetings in Miami and the extensive correspondence in connection with the business relationship at issue in this lawsuit. *See Dublin Co. v. Peninsular Supply Co.*, 309 So.2d 207, 210 (Fla. 4th Dist.Ct.App. 1975) (holding that defendant's past sales and visit by defendant's president to discuss product sold satisfies statutory test under Florida long arm statute regarding specific jurisdiction). Once again, Defendants have relied on cases that are distinguishable from the instant proceeding. *See Pacific Coral*

*Shrimp v. Bryant Fisheries*, 844 F.Supp. 1546 (S.D.Fla.1994) (finding no jurisdiction on constitutional due process grounds because the transaction giving rise to the cause was not a long-term contract but rather a "one time deal"). In comparison, the discussions and meetings in the instant case involved numerous transactions, and were not tied to an isolated, short-term arrangement similar to that in *Pacific Coral.*

■■■ Defendants also fail to persuade us that the commission of the alleged torts do not constitute a valid basis for the exercise of Florida long arm jurisdiction pursuant to Fla.Stat. § 48.193(1)(b). In this connection, Plaintiff submits that Defendants Park, Otomation and Techmedia have made various misrepresentations and have interfered with its contractual relations by soliciting Future Tech's customers and competitors. "It is well established that the commission of a tort for purpose of establishing long-arm jurisdiction does not require physical entry into the state, but merely requires that the place of *injury* be within Florida." *International Harvester v. Mann*, 460 So.2d 580, 581 (Fla. 1st Dist.Ct.App.1984). Moreover, this subsection of the Florida long arm statute must be read broadly by courts in conformity with statutory policy. *Rebozo v. Washington Post Co.*, 515 F.2d 1208, 1213 (5th Cir.1975). Allegations regarding "purposeful, non fortuitous, intentional tortious acts" have been deemed sufficient to comport with the requirements of § 48.193(1)(b). *See, e.g., Wood v. Wall*, 666 So.2d 984 (Fla. 3d Dist.Ct.App. 1996). In view of Future Tech's allegations concerning misrepresentations received in Florida concerning the exclusivity of the Latin American market, noninterference with the South American market and price protection, we are hard pressed to conclude that jurisdiction could not also be grounded upon § 48.193(1)(b) as to Defendants Park, Otomation and Techmedia. We reiterate, however, that Future Tech has failed to demonstrate anything in the record that would establish a basis for exercising jurisdiction over Defendant Tae Il USA, or in any manner controvert the Choo declaration, which states that Tae Il USA has had no contact with Florida or the Plaintiff.

B. *Due Process*

The second prong of the personal jurisdiction inquiry requires the Court to focus on whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment. We find that Defendants Park, Techmedia and Otomation's continuous and systematic contacts with Florida provide an ample basis for the exercise of personal jurisdiction over them in accordance with federal due process.[8]

The due process requirement was fully outlined by the Eleventh Circuit in *Madara v. Hall*, 916 F.2d 1510 (11th Cir.1990).

This court has recognized that the determination of whether the assertion of personal jurisdiction over a nonresident defendant comports with due process is itself a two-prong inquiry. First, we decide whether Hall established "minimum contacts" with Florida. Second, we decide whether the exercise of personal jurisdiction over Hall would offend " 'traditional notions of fair play and substantial justice.' " *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 392 (11th Cir.1988) (quoting *International Shoe Co. [v. Washington]*, 326 U.S. [310] at 316, 66 S.Ct. [154] at 158 [90 L.Ed. 95 (1945)])....

Where a forum seeks to assert specific personal jurisdiction over a non-resident defendant, due process requires the defendant have "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, ·J. concurring in judgment). This fair warning requirement is satisfied if the defendant has "purposefully directed" his activities at the forum, *Keeton*, 465 U.S. at 774, 104 S.Ct. at 1473, and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182 (quoting *Helicopteros Nacionales de Colombia, S.A.*

*v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984)).

Additionally, the defendant's conduct and connection with the forum must be of a character that he should reasonably anticipate being haled into court there. *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183; *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). However,

the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State ... it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958). This requirement assures that a defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts, *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183; *Keeton [v. Hustler Magazine, Inc.]*, 465 U.S. [770] at 774, 104 S.Ct. [1473] at 1478 [79 L.Ed.2d 790 (1984)], or because of the unilateral activity of a third person. *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183; *Helicopteros*, 466 U.S. at 417, 104 S.Ct. at 1873. Jurisdiction is proper where the defendant's contacts with the forum proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum state. *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *McGee v. International Life Ins., Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). Although the concept of foreseeability is not irrelevant to this analysis, the kind of foreseeability critical to the proper exercise of personal jurisdiction is *not* the ability to see that the acts of third persons may affect the forum, but rather that the defendant's own purposeful acts will have some effect in the forum. *See Asahi Metal Indus. Co. v. Superior*

---

8. We need not discuss the due process considerations concerning Defendant Tae Il Media USA, in view of our finding that the Plaintiff has failed to sustain its burden of showing that the exercise of jurisdiction over this Defendant would be consonant with the Florida long arm statute.

*Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987).

Once it has been determined that the non-resident defendant has purposefully established minimum contacts with the forum such that he should reasonably anticipate being haled into court there, these contacts are considered in light of other factors to decide whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe Co.,* 326 U.S. at 320, 66 S.Ct. at 160). These other factors are the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184; *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564. Minimum requirements of "fair play and substantial justice" may defeat the reasonableness of asserting personal jurisdiction even if the defendant has purposefully engaged in forum activities. *Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185. Conversely, these considerations may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *Id.* at 477, 105 S.Ct. at 2184.

*Id.* at 1515–17 (footnotes omitted).

■ We have little difficulty in concluding on these facts that Defendants Park, Techmedia and Otomation purposefully availed themselves of their business activities within Florida, and maintained continuous and significant contacts with the State. As detailed above, each of these Defendants engaged in various business activities in Florida during 1994 and 1995 in order to cultivate and maintain a business relationship with Future Tech. This effort necessitated trips to Florida, as well as correspondence and phone calls to Future Tech personnel in Florida. Evidence of these contacts undermines the moving Defendants' suggestion that none of them conducted business in Florida. Indeed, it has been noted that "a defendant's participation in substantial preliminary negotiations conducted in the forum state leading to the contract in issue is a sufficient basis for personal jurisdiction." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.,* 28 F.3d 572, 581 (7th Cir.1993). Moreover, the contracts at issue contemplate significant acts of performance in Florida, and the agreements provide that Florida law applies to govern the terms of the instrument. In short, on the record before the Court, we conclude that the nature, quality and circumstances of Defendants Park,[9] Techmedia, and Otomation's contacts with the State of Florida constitute a sufficient affiliation with the forum to rise to a level that the moving Defendants should reasonably have anticipated being haled into a Florida court.

■ The second prong of the due process minimum contacts analysis relates to whether the exercise of jurisdiction would comport with "fair play and substantial justice." This requires a court to engage in a balancing test in order to assess the reasonableness of the exercise of jurisdiction, notwithstanding the fact that the defendant is found to have purposefully availed itself of various activities within the forum. *Burger King Corp.,* 471 U.S. at 477–78, 105 S.Ct. at 2184–85. Factors to be considered in this regard include the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering substantive

---

**9.** Defendants also suggest that the "corporate shield" doctrine ought to preclude the exercise of jurisdiction over Defendant Park. However, this doctrine is inapplicable to allegations of fraud or other similar misconduct, as is the case here. *See Doe v. Thompson,* 620 So.2d 1004, 1006 n. 1 (Fla.1993) (stating that "[a] corporate officer committing fraud or other intentional misconduct can be subject to personal jurisdiction"). The record establishes, for purposes of resolving this personal jurisdiction issue, that Park may have committed acts of misrepresentation and other intentional torts that led to injury in Florida.

social policies. *Id.* Evaluation of these factors unquestionably weighs in favor of recognizing jurisdiction over the moving Defendants. Park, Techmedia and Otomation would not be unduly burdened by litigation in Florida, and the exercise of jurisdiction in this case would comport with Plaintiffs' interest in obtaining convenient and effective relief for wrongs that have a strong relation to Florida. In short, considerations of "fair play and substantial justice" do not support the relief that these Defendants seek.

## IV.

Independent of their jurisdictional objections, Defendants Tae Il USA, Techmedia and Otomation have moved to dismiss Future Tech's complaint or, in the alternative, for summary judgment. Future Tech responded to these motions on February 20, 1996, and the moving Defendants replied on April 1, 1996. The moving Defendants assert that the complaint fails to state a cause of action because it sues persons not parties to the contracts, in violation of the parol evidence rule and the statute of frauds. They also assert that the complaint "improperly mixes tort and contract claims in violation of the economic loss rule." They further assert that the Plaintiff's allegations are insufficient to support its claim in Count V for tortious interference with business relationships. For the reasons that follow, we agree that the statute of frauds bars the contract claims against the movants, because there is nothing in any of the written agreements that demonstrates that the movants are parties to the contracts, and parol evidence is not admissible to demonstrate otherwise. However, we do not agree that the tort claims embodied in Counts II, V, VI, VII are barred by the economic loss rule, since these claims are separate and distinct from Future Tech's contract claims. Finally, the allegations in Count V are sufficient to support the asserted cause of action for tortious interference.

### A. *Standard of Review*

■ The purpose of a Rule 12(b)(6) motion is to test the facial sufficiency of the statement of claim for relief. It is read along with Rule 8(a) of the Federal Rules of Civil Procedure, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The motion is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto. *See* 5 Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1356 at 590–92 (1969). Moreover, for the purposes of the motion to dismiss, the complaint must be construed in a light most favorable to the plaintiff and the factual allegations taken as true. *See SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir.), *reh'g denied,* 840 F.2d 25 (11th Cir.), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988).

According to the Eleventh Circuit:

> [T]he Supreme Court has stated that the "accepted rule" for appraising the sufficiency of a complaint is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.,* 786 F.2d 1115, 1117–18 (11th Cir. 1986) (quoting *Conley* ).

*Id.* A complaint may not be dismissed because the plaintiff's claims fail to support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* possible theory. *Robertson v. Johnston,* 376 F.2d 43 (5th Cir.1967). We hasten to add that this motion is viewed with disfavor and rarely granted. *See e.g., Madison v. Purdy,* 410 F.2d 99, 100 (5th Cir.1969); *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service,* 400 F.2d 465, 471 (5th Cir.1968) (noting that "[d]ismissal of a claim on the basis of barebone pleadings is a precarious disposition with a high mortality rate."). The pleadings must show, in short, that the Plaintiff has no claim before the 12(b)(6) motion may be granted.

The standard to be applied in reviewing summary judgment motions is stated unam-

biguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It may be entered only where there is *no* genuine issue of material fact. Moreover, the moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). As the Eleventh Circuit has explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh*, 651 F.2d [983] at 991 [ (5th Cir.1981) ]. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh*, 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc. v. Wackenhut Protective Systems, Inc.]*, 669 F.2d [1026] at 1031 [ (5th Cir.1982) ]; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*[ ], 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh*, 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir. 1967). *See Dalke v. Upjohn Co.*, 555 F.2d 245, 248–49 (9th Cir.1977).

*Clemons v. Dougherty County*, 684 F.2d 1365, 1368–69 (11th Cir.1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The United States Supreme Court has provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment:

> [The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court in *Anderson* further acknowledged that "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. at 2512. In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* at 254, 106 S.Ct. at 2513. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most

favorable to the non-movant, to support a jury finding in his favor, summary judgment may be granted. *Id.* at 254–55, 106 S.Ct. at 2513–14.

In a companion case, the Supreme Court declared that a non-moving party's failure to prove an essential element of his claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will *bear* the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). We measure the Defendants' motions against these standards.

**B.** *Statute of Frauds/Parol Evidence Rule*

By this argument, the moving Defendants submit that the contract claims embodied in Count I (breach of exclusivity agreement), Count III (breach of purchase orders), Count IV (breach of warranty) and Count IX (breach of price agreement) are barred, because they are not parties to the contracts at issue and parol evidence is not admissible to show otherwise. We agree that since the moving Defendants are not parties to the contract(s) alleged in the complaint, dismissal or summary judgment of the contract claims as to these Defendants is warranted.

The contract claims at issue are alleged in the complaint in these terms:

**COUNT I**

**(Breach of Contract)**

82. Plaintiff reallege[s] and incorporates by reference the allegations of paragraphs 1 through 81.

83. In June, 1994, and in November, 1994 the parties entered into an agreement whereby Plaintiff would be the exclusive distributer of any monitor or system built by Defendant Tae Il Media in Latin America.

84. The agreement of exclusivity was confirmed in February 8 through 10, 1995 and through an exchange of correspondence on February 13, and February 15, 1995. That agreement is quoted in the preceding paragraphs of this complaint.

85. The agreement was again confirmed by the execution of a joint venture agreement of July 26, 1995.

86. Defendants have breached the aforesaid agreements by selling or causing products to be sold to Plaintiff's customers and others in Latin America in violation of the aforesaid described agreements.

87. By reason of the breaches described above, Plaintiff's distribution channels have been disrupted. In addition to its other damages, Plaintiff has lost profits in the past and will lose further profits in the future and has incurred substantial expense. These damages exceed the sum of $100,000,000.

. . . . .

**COUNT III**

**(Breach of Purchase Orders by Failing to Deliver Product and Late Deliveries)**

93. Plaintiff reallege[s] and incorporates herein by reference the allegations of Paragraphs 1–81 above.

94. From June 1994 through October 1995, Plaintiff entered into Agreements through purchase orders with Defendants, whereby Tae Il Media, Ltd. was to sell to Plaintiff certain monitors and computer systems with the MarkVision branded name on them.

95. Defendant Tae Il Media, Ltd. breached the aforesaid described contract by: (a) failing to deliver in excess of 70,000 moni-

tors ordered pursuant to open purchase order; and (b) delivering monitors and computer systems in an untimely manner.

96. As the proximate cause of the aforesaid described breaches of contract, Plaintiff had been damaged including lost profits on the products not supplied and the products delivered late and other products that were adversely affected by reason of the aforesaid failure, increased expenses, increased advertising expenses and other related consequential damages in excess of One Hundred Million Dollars ($100,000,-000.00).

### COUNT IV

#### (Breach of Contract and Warranty)

97. Plaintiff reallege[s] and incorporates by reference the allegations of paragraphs 1 through 81 above.

98. As described above, the initial orders of MarkVision branded computer systems were assembled and delivered in defective condition.

99. As a result of the foregoing, Defendant Tae Il Media, Ltd. has breached its express contractual warranty and its warrant[i]es of merchantability and fitness of purpose.

100. As a result of the foregoing, Plaintiff ha[s] been damaged in excess of One Million Dollars ($1,000,000.00).

. . . . .

### COUNT IX

#### (Breach of Contract)

119. Plaintiff reallege[s] and incorporates by reference the allegations of paragraphs 1 through 81 by reference.

120. As described above, Defendant Tae Il Media, Ltd. regularly increased its price for monitors and for computer equipment in violation of the terms of the previous purchase agreements with respect to those same monitors and systems.

121. As the proximate result of the aforesaid described misconduct, Plaintiff has been damaged in excess of One Hundred Million Dollars ($100,000,000.00).

Compl., at ¶¶ 82–87, 93–100, 119–121.

As even a cursory review of these allegations reveals, the only contract claim asserting a breach by the moving Defendants is Count I. *Id.* at ¶ 86. Counts III, IV, and IX concern only Defendant Tae Il Media. Thus, we need only consider the moving Defendants' application in connection with Count I, which alleges a breach of the exclusivity agreement allegedly entered into in June and November 1994, and later confirmed on various dates in February, 1995 and again in the joint venture agreement of July 26, 1995.

It is axiomatic that maintenance of a contract action requires that the defendant be a party to the contract at issue. The Florida statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Fla.Stat. § 672.201(1).

■ In this case, the only signed contract between the parties to this lawsuit is the August 10, 1994 agreement between Plaintiff Future Tech and Defendant Tae Il Media. Appendix to Mem. of Law in Supp. of Defendants' Rule 9, Rule 12 and Rule 56 Mot. to Dismiss and Rule 56 Mot. for Summ. J'ment, January 16, 1996, Dec. of Byungil Park, Ex. A. The August 10th agreement provides in pertinent part:

### AGREEMENT

This Agreement is entered into this 10 day of August, 1994 between Tae Il Media Co., Ltd., of Seoul, Korea, (hereinafter "Company") and Future Tech Inc., of Miami, Florida, U.S.A. (hereinafter "Exclusive Distributer") for the purposes and according to the terms set forth hereinbelow.

. . . . .

*Facilities, Ability, and Desire of the Parties*

Company is desirous of having the exclusive Distributor develop demand for and sell the products referred to hereinabove in the manner, and according to the terms set forth hereinafter.

. . . . .

### ENTIRE AGREEMENT

3.01. This agreement contains the entire agreement between the parties, with respect to the subject matter hereof, and there are no other terms, agreements, understandings, representations or warranties between the parties other than those specifically set forth or referred to herein.

. . . . .

### MODIFICATIONS AND AMENDMENTS

3.03. This Agreement may not be modified or amended except by a[n] instrument in writing signed by both parties.

*Id.* The signatory parties to this agreement are Tae Il Co. and Future Tech—the moving parties, Tae Il U.S.A., Techmedia and Otomation, are *not* parties to the agreement. Moreover, none of the many letters and other exhibits proffered by the Plaintiff demonstrates that the moving Defendants were parties to the exclusivity agreement, or that these documents constituted written modifications of the original contract. All Future Tech suggests is that the later documentation, including the various letters and faxes, "confirm" the earlier contract. This Court has previously discussed the general principles of contract interpretation:

> It is well-settled that when contractual language is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain meaning. *Hurt v. Leatherby Insurance Company,* 380 So.2d 432 (Fla.1980). A court may not violate the clear meaning of a contract in order to create an ambiguity. *Hoffman v. Robinson,* 213 So.2d 267 (Fla.App.1968). An ambiguity exists only when a word or phrase in a contract is of uncertain meaning and may be fairly understood in more ways than one and is susceptible of more than one meaning and of interpretation in opposite ways. *Friedman, et al. v. Virginia Metal Products Corp.,* 56 So.2d 515 (Fla.1952). But, if a contract is unambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the contract terms will be given their plain meaning. *Herrero v. Herrero,* 528 So.2d 1286 (Fla. 2d DCA 1988).

*Rey,* 766 F.Supp. at 1146 (S.D.Fla.1991). Moreover, the United States Court of Appeals for the Eleventh Circuit has observed:

> Courts may not rewrite contracts to add meaning or to create an ambiguity. *State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So.2d 1245, 1248 (Fla.1986). There must be "a genuine inconsistency, uncertainty, or ambiguity in meaning [that] remains after resort to the ordinary rules of construction." *Excelsior* [*Ins. Co. v. Pomona Park Bar & Package Store* ], 369 So.2d [938] at 942 [ (Fla.1979) ]. Further, ambiguity is not invariably present when a contract requires interpretation, *Weldon* [*v. All American Life Ins. Co.*], 605 So.2d [911] at 915 [ (Fla. 2d DCA 1992) ]; *Gulf Tampa Drydock* [*Co. v. Great Atlantic Ins. Co.*], 757 F.2d [1172] at 1175 [ (11th Cir. 1985) ], and failing to define a term does not create ambiguity per se. *Jefferson Ins. Co. v. Sea World, Inc.,* 586 So.2d 95, 97 (5th DCA 1991).

*Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1381–82 (11th Cir.1993). In another case, the Eleventh Circuit added that "[u]nder Florida law, evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Chase Manhattan Bank v. E.B. Rood,* 698 F.2d 435, 436 (11th Cir.1983) (footnote omitted). In contrast, "if an ambiguity exists, parol evidence is properly admitted to resolve such ambiguity and explain the intention of the parties to the contract." *Royal Continental Hotels, Inc. v. Broward Vending, Inc.,* 404 So.2d 782, 783–84 (Fla. 4th Dist.Ct.App. 1981). When the language to a contract is unambiguous, "the legal effect of that language is a question of law" and may be resolved summarily. *Orkin Exterminating Co. v. Federal Trade Comm'n,* 849 F.2d 1354, 1360 (11th Cir.1988).

A review of the documentation in this case reveals that only Defendant Tae Il Media was a party to any contract upon which Plaintiff could sue for breach of an exclusivity agreement (Count I). The August 10, 1994 contract unambiguously indicates that the only contracting parties are Plaintiff Future Tech and Defendant Tae Il Media. Extrinsic evidence may not be used to vary or modify the clear terms of the identity of the contracting parties under Florida law. In other words, while other terms in the contract may or may not be ambiguous, the fact remains that the only way extrinsic evidence may be admissible to vary the contract as to the identity of the contracting parties would be if the very identity of the contracting parties was vague or ambiguous. That is not the case here, and accordingly the statute of frauds and parol evidence rule compel dismissal of Count I of the Complaint as to the moving Defendants, because they are not parties to any agreement concerning exclusivity. And as already noted, the other contract counts outlined in Counts III, IV, and IX do not even allege a breach by the moving Defendants, but rather assert breaches by Defendant Tae Il Media.

## C. Economic Loss Rule

The familiar "economic loss rule," as discussed by the Florida Supreme Court in *Florida Power & Light Co. v. Westinghouse Electric Corp.*, 510 So.2d 899 (Fla. 1987) and *AFM Corp. v. Southern Bell Tel. & Tel.*, 515 So.2d 180 (Fla.1987), holds that without allegations of physical injury or property damage, there can be no independent tort claiming solely economic losses flowing from a contractual breach. Although "the mere existence of a contract claim does not automatically vitiate all causes of action in tort," *Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1543 (11th Cir.1990), contract principles, rather than tort principles, must be applied to resolve claims that expressly or essentially seek damages for economic losses attendant to a breach of con-

tract. *See AFM Corp.*, 515 So.2d at 181. The rationale for the rule is that tort law and contract law must be held apart in order to foster the reliability of commercial transactions. Where the parties have limited liability and allocated risk by agreement, tort remedies should not be allowed to supersede the parties' prior understanding of the consequences of deficient performance. Contractual duties are imposed by agreement between the parties; the scope of those duties and liability in the event of their breach is limited by the agreement. Tort duties, by contrast, are imposed by society, may not always be limited by the understanding of the parties, and can give rise to more punitive remedies if a breach occurs. As observed by the Eleventh Circuit, however, "[t]ort claims can be appropriate under Florida law where there is some wrongful conduct which amounts to an independent tort in addition to the conduct resulting in the contractual breach." *Kee*, 918 F.2d at 1543; *see also AFM Corp.*, 515 So.2d at 181 (noting that "'a breach of contract, alone, cannot constitute a cause of action in tort.... It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence'") (*quoting Electronic Security Systems Corp. v. Southern Bell Tel. & Tel. Co.*, 482 So.2d 518, 519 (Fla. 3d Dist. Ct.App.1986)).

The moving Defendants suggest that the Plaintiff's tort claims, as embodied in Count II (fraud in the inducement), Count V (tortious interference with business relationships), Count VI (theft of trade secrets) and Count VII (breach of fiduciary duty), fail to state a claim for relief, because they do not allege torts independent of Future Tech's claims for breach of contract. Moreover, according to the Defendants, the damages allegedly flowing from the claimed breaches do not suggest any injury to person or property apart from damages due to the alleged breach of contract. We are unpersuaded.[10]

---

**10.** The tort claims at issue are alleged in the following terms:

### COUNT II
### (Fraud in the Inducement)

88. Plaintiff reallege[s] and incorporates by reference the allegations of paragraphs 1 through 81 by reference.

As we've noted already, the Plaintiff's contract claims against the moving Defendants fail, because these Defendants are not identifiable parties to the contracts at issue. As a result, it follows that the economic loss rule cannot bar Future Tech's tort claims against these Defendants. Even if we were to assume that the moving Defendants were parties to the disputed contract(s) with Future Tech, however, we would hold that the economic loss rule does not preclude Plaintiff from proceeding with its tort claims.

 With respect to Count II, the fraud in the inducement claim, this Court in *Lei-*

89. Defendants, from the Summer of 1994 through July, 1995, have made the following misrepresentations to the Plaintiff:

a. That Defendants would make timely deliveries of product ordered from the Defendants when they knew they would not be able to do so at the time of said promise;

b. That the Defendants were not and would not be in the computer systems manufacturing business for the manufacture of computers for use except in Korea and China when the Defendants knew that they were and would be manufacturing computers for use world wide and therefore able to appropriate confidential information which Plaintiff's engineers would impart to them.

c. That the Defendants would not and had not sold their product in Latin America when the Defendants then knew that they had not and would not comply with Plaintiff's exclusivity.

d. That the Defendants would perform on the contracts described in Count I and II including delivery on the dates agreed upon at time of purchase order when, at the time of each contract and promise, Defendants had no intention of performing.

90. Plaintiff justifiably relied upon the aforesaid described misrepresentations to its detriment.

91. Defendants' conduct was in wanton and wilful disregard of the rights of the Plaintiff.

92. Plaintiffs have been damages through the loss of sales, lost profits extra expense, and disruption of its distribution channel in excess of One Hundred Million Dollars ($100,000,-000).

. . . . .

## COUNT V
### (Tortious Interference with Business Relationships)

101. Plaintiff reallege[s] and incorporates herein by reference the allegations of paragraphs 1 through 81.

102. As described below, Plaintiff[] enjoyed an advantageous business relationship with each of the customers in its business channel.

103. The conduct described above was designed to wrongfully interfere with the advantageous business relationship which Plaintiff then had ongoing with customers in this business channel.

104. The aforesaid described conduct constituted an interference with Plaintiff's business relationship and with Plaintiff's contracts with its customers. Said conduct was wrongful and unjustified.

105. As the proximate result of the foregoing described misconduct Plaintiff has been damaged in excess of One Hundred Million Dollars ($100,000,00.00).

## COUNT VI
### (Theft of Trade Secret)

106. Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 81 above.

107. As described above, Plaintiff and Defendants has a confidential relationship between them.

108. In the course of and within the scope of that confidential relationship, Plaintiff made various disclosures to Defendants including the confidential design of a motherboard for sue in Plaintiff's computer systems and Plaintiff's customer list.

109. The aforesaid described information, the design of the motherboard and the customer list, are Plaintiff's trade secrets.

110. Defendants have misappropriated Plaintiff's trade secrets as described above.

111. As the proximate result of the aforesaid described misconduct, Plaintiff has suffered lost profits, additional expenses, and further is entitled to an order declaring that it is entitled all proceeds of sales made by the Defendants using the confidential information wrongfully misappropriated by the Defendants.

112. The amount of the aforesaid described damages is in excess of One Hundred Thousand Dollars ($100,000.00).

## COUNT VII
### (Breach of Fiduciary Duty)

113. Plaintiff reallege[s] and incorporates by reference the allegations of paragraphs 1 through 81 above.

114. As a result of the confidential relationship between the parties, a fiduciary relationship arose from Defendants to Plaintiff.

115. Defendants breached the aforesaid described fiduciary duty by usurping trade secrets as described above, by interfering with Plaintiff['s] distribution channel as described above, by engaging in the other misconduct which is described above including but not limited to the withholding of MarkVision branded product and the attempt to substitute Techmedia branded product instead.

116. As the proximate result of the aforesaid described misconduct, Plaintiff has been damaged in excess of One Hundred Million Dollars ($100,000,000.00).

Compl., at ¶¶ 88–92, 101–116.

*sure Founders, Inc. v. CUC International, Inc.,* 833 F.Supp. 1562 (S.D.Fla.1993) applied the settled principle that the economic loss rule does not bar a cause of action for fraudulent inducement:

> Ultimate proof of a claim for fraudulent inducement to contract ... involves elements entirely distinct from a showing that the Defendants willfully breached an agreement; at trial, Plaintiffs must demonstrate that Defendants convinced them to enter into the agreement by means of deceitful representations and that all along the contract was a ruse the obligations of which Defendants never intended to perform.

True fraudulent inducement attends conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting. *See Williams Electric Co. v. Honeywell, Inc.,* 772 F.Supp. 1225, 1238 (N.D.Fla.1991). "It is based on pre-contractual conduct which is, under the law, a recognized tort." *Id.* Where the complaint alleges fraudulent inducement, but the facts comprising the fraudulent inducement claim are closely interwoven with those constituting the breach of contract, the economic loss rule bars the pleading of a separate tort claim. *See Serina v. Albertson's Inc.,* 744 F.Supp. 1113, 1118 (M.D.Fla.1990); *John Brown Automation, Inc. v. Nobles,* 537 So.2d 614, 617–618 (Fla. 2d DCA 1988) (striking punitive damages for fraud where the misrepresentation was "inextricable from the events constituting a breach of contract"); *J. Batten Corp. v. Oakridge Investments 85[,] Ltd.,* 546 So.2d 68, 69 (Fla. 5th DCA 1989) (dismissing fraud claim in breach of contract case). No Florida case that we can find has expressly held that true fraudulent inducement does not come within the ambit of the economic loss rule. One Florida appellate court, however, deciding under the economic loss rule that a showing of fraud at a trial of a breach of contract case could not support an award of punitive damages, noted the "constant untangled thread running through all the cases" indicating that a fraud claim is precluded where it is "associated with the *performance* of a contract" and that the

economic loss rule would not bar a fraud claim if the pleadings alleged "an intent on the part of [the defendants] not to fulfill the contract when it was formed." *John Brown,* 537 So.2d at 617–618.

*Leisure Founders,* 833 F.Supp. at 1572–73; *see also Brass v. NCR Corp.,* 826 F.Supp. 1427, 1428 (S.D.Fla.1993) (stating that "in a fraud in the inducement setting, the intentional fraud which occurs and is completed prior to the formation of the contract can be characterized as 'independent' of the contract. Thus, a fraud in the inducement claim [is not barred by] the Economic Loss Rule discussed in *AFM Corp.*") (citations omitted); *Burton v. Linotype Co.,* 556 So.2d 1126, 1128 (Fla. 3d Dist.Ct.App.1989) *rev. denied,* 564 So.2d 1086 (Fla.1990) ("[Plaintiffs] urge that negligent misrepresentation, fraud and misleading advertising are torts independent of their breach of warranty claims. We agree. Fraud in the inducement and deceit are independent torts for which compensatory damages and punitive damage may be recovered."). To reiterate, the economic loss doctrine holds that, without some conduct resulting in personal injury or property damage, economic losses may not be recovered in tort when they flow from a contractual breach. *AFM Corp.,* 515 So.2d at 181–82. However, if the breach of contract is attended by some additional conduct that amounts to an independent tort, then an action to recover for the independent tort may proceed. *Id.* at 181. As fraud in the inducement has been held to be a tort independent from breach of contract, the economic loss doctrine plainly does not prohibit Plaintiff from proceeding on Count II.

■ Similarly, the tortious interference with business relationships claim in Count V is not barred by the economic loss rule. The gist of Future Tech's cause of action is that the Defendants interfered with its relationships with Latin American customers. Although in the broadest sense this allegation can be seen as an offshoot of breach of the exclusivity arrangement claim asserted in Count I of the complaint, the focus here is on the Defendants' behavior with regard to third parties, rather than the contractual relationship between Future Tech and the De-

fendants. Moreover, Future Tech alleges that the Defendant did more than "compete" with it for customers; rather, it contends that the Defendants activity solicited Future Tech clients to abandon their contracts with the Plaintiff and obtain computer products from them. From this standpoint, the tortious interference claim is independent from any contractual obligations that may exist among the parties.

 With respect to the claim for theft of trade secrets, we similarly conclude that the economic loss rule presents no bar to relief. Actions for civil theft and conversion are not barred simply because there is a contractual relationship between the parties. *See Lajos v. duPont Pub.*, 888 F.Supp. 143 (M.D.Fla.1995); *Gordon v. Omni Equities, Inc.*, 605 So.2d 538 (Fla. 1st Dist.Ct.App. 1992). At the same time, where a claim for civil theft is "exactly coextensive with the nonperformance of an agreement between the parties," such a claim may not stand. *Leisure Founders*, 833 F.Supp. at 1574. The alleged misappropriation of the design of the motherboard and customer list is independent of any agreement between Plaintiff and the moving Defendants. The contract(s) identified in the complaint refer to exclusivity and the sale of computer equipment, and are not coextensive with the conduct alleged in the civil theft claim. Defendants do not point to a single provision of the asserted contract(s) that concerns the parties' rights with regard to possession of the motherboard and Future Tech's customer list. Accordingly, the economic loss rule does not preclude assertion of the claim.

 Finally, we conclude that the economic loss rule does not bar the breach of fiduciary duty claim embodied in Count VII. As a general matter, "[c]ourts have found a fiduciary relation implied in law when 'confidence is reposed by one party and a trust accepted by the other.' *Dale v. Jennings*, 90 Fla. 234, 244, 107 So. 175, 179 (1925)." *Capital Bank v. MVB, Inc.*, 644 So.2d 515 (Fla. 3d Dist.Ct.App.1994). Again, the economic loss rule does not apply here, because this cause of action, which relates to the misap-

propriation of trade secrets and other similar misconduct, is largely unrelated to the contract claim. Defendants' reliance upon *Interstate Securities Corp. v. Hayes Corp.*, 920 F.2d 769 (11th Cir.1991) is unavailing. In *Interstate*, the breach of fiduciary claim arose in the context of a contract between a securities broker and an investor. The Eleventh Circuit noted that the fiduciary relationship in dispute "does not arise unless the parties have entered into a contract involving the trade of securities. A plaintiff need not prove any affirmative action by the defendant in order to establish a breach of fiduciary duty, only that the duty was breached by improper action or by the failure to take necessary action." *Id.* at 777. The panel added that "[i]n our judgment, a fraud claim, which is in no way dependent upon a contract and inherently requires affirmatively fraudulent conduct by the defendant, is much more likely to constitute a separate and independent tort than is a claim for breach of fiduciary duty, which is dependent upon the existence of a contract." *Id.* As *Interstate* suggests, when the parties' contract is the source of the fiduciary duty claim, the economic loss rule may apply. Here, by contrast, the fiduciary duty allegations, for the most part, relate to affirmative acts by the Defendants that were not addressed in any of the parties' agreement(s) and went beyond the scope of the duties imposed by the contract(s) at issue. For this reason, Future Tech's cause of action in Count V is not barred. At all events, we reiterate that the economic loss rule is inapposite to the claims against the moving Defendants, because we find that these Defendants are not parties to contracts with Future Tech.

### C. Tortious Interference Claim

 The moving Defendants make the additional argument that the Plaintiffs' claims for tortious interference with business relationships in Count V of the complaint fail to state a claim because it does not allege malicious interference with an identifiable agreement.[11] The elements of this tort are 1) the existence of a business relationship under which the claimant has rights; 2) the

---

11. The allegations supporting Count V are reproduced *infra*.

defendants's knowledge of the relationship; 3) an intentional and unjustified interference with the relationship; 4) by a third party; and 5) damages to the claimant caused by the interference. *See Greenberg v. Mount Sinai Med. Center,* 629 So.2d 252, 255 (Fla. 3d Dist.Ct.App.1993). Moreover, the Florida Supreme Court has observed:

> In Florida, a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large. *Southern Alliance Corp. v. Winter Haven,* 505 So.2d 489, 496 (Fla. 2d DCA 1987). As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So.2d 812, 815 (Fla.1994). A plain reading of Plaintiff's claim reveals that Future Tech is not grounding its tortious interference claim upon relationships with the community at large. Instead, it asserts that the Defendants have interfered with advantageous and on-going business relationships with existing customers. Compl. at ¶¶ 101–105. Although the complaint is drafted at a high order of abstraction, and does not specifically identify each of the relationships allegedly interfered with, we are hard pressed to conclude that at this early stage of the proceedings that Future Tech could prove no facts to support its cause of action. Additional specificity is not required under our liberal system of notice pleading. By the same token, until meaningful discovery has taken place, the movants' request for summary judgment seems premature. We also note that the Plaintiff already has submitted certain evidence tending to show interference by the Defendants. *See* Leonardo aff., at ¶¶ 19–20 (describing specific instances where the Defendants allegedly solicited Future Tech customers); Crespo aff., at ¶ 39 (same).

■■■ The moving Defendants further challenge the Plaintiffs' claim because "malice" is not alleged. A plain review of the elements of the tort make clear, however, that an express allegation of "malice" is not required, and is at all events implicit within the elements outlined in *Greenberg.* The principal case cited by the movants in support of their assertion that malice must be alleged as the basis for a tortious interference claim, *Boehm v. American Bankers Ins. Group,* 557 So.2d 91 (Fla. 3d Dist.Ct.App. 1990), is inapposite. In *Boehm,* the court considered a defamation and tortious interference claim brought by one of the defendant's former employees, who alleged that the defendant's president made defamatory statements about him to an executive search agent hired by a prospective new employer. The Third District Court of Appeal affirmed the district court's order of summary judgment in favor of the former employer. In so doing, the panel noted that, because the president's statements were entitled to a qualified privilege under Florida law, the plaintiff needed to prove that the statements were made with malice in order to prevail. *Id.* at 93–95. Here, however, there is no suggestion that the alleged conduct on the part of the Defendants is entitled to a qualified privilege similar to that afforded employers who communicate information about former employees. For this reason, proof of malice is not an element of the tort alleged by Future Tech, and the Plaintiffs' cause of action may go forward.

### V.

Defendant Andrew Park has filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), arguing that counts II, VI and VII fail to plead fraud with the specificity required by Fed.R.Civ.P. 9(b).[12] In response, Future Tech maintains that the allegations are sufficient to withstand a motion to dismiss for lack of particularity under Fed.R.Civ.P. 9(b)

---

**12.** Park also incorporates by reference the Rule 12(b)(6) arguments presented by the corporate Defendants. These arguments are addressed in Part IV of this Order. Park's additional application to dismiss Future Tech's claim for punitive damages was granted in this Court's Order of June 4, 1996.

as to Park, because the complaint alleges that he made misrepresentations and the nature of the misrepresentations are adequately pled. We agree.

Rule 9(b) of the Federal Rules of Civil Procedure provides:

Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of the mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). A plaintiff must allege fraud with sufficient particularity to permit "the person charged with fraud ... [to] have a reasonable opportunity to answer the complaint and adequate information to frame a response." *In Re U.S. Oil and Gas Litigation,* 1988 WL 28544, at *2, 1988 U.S. Dist. LEXIS 2217 at 4 (S.D.Fla.1988). The allegations must therefore be accompanied by "some delineation of the underlying acts and transactions which are asserted to constitute fraud." *Merrill Lynch, etc. v. Del Valle,* 528 F.Supp. 147, 149 (S.D.Fla.1981). Put another way, the complaint must describe specific acts and omissions which, if true, might well be found after a trial to constitute fraudulent conduct on the part of the defendants. *See Felton v. Walston & Co.,* 508 F.2d 577, 582 (2nd Cir.1974). *Leisure Founders,* 833 F.Supp. at 1574; *Tapken v. Brown,* 1992 WL 178984, *8 (S.D.Fla. March 13, 1992).

The Eleventh Circuit has observed that the "clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed." *Friedlander v. Nims,* 755 F.2d 810, 813 n. 3 (11th Cir.1985). It also has been noted that "conclusory allegations" of fraud are insufficient to meet the particularity requirement of Rule 9(b). *Summer v. Land & Leisure, Inc.,* 664 F.2d 965, 970 (5th Cir. Unit B.1981), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982). That

being said, "Rule 9(b) must be read in conjunction with Rule 8(a) [of the Federal Rules of Civil Procedure], which requires a plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief." *O'Brien v. National Prop. Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989) (citing *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2nd Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)). Thus, "alternate means are available" to satisfy the Rule. *Durham v. Business Mgmt. Assoc.,* 847 F.2d 1505, 1511 (11th Cir.1988); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (finding list of alleged misrepresentations sufficient where the complaint described the nature and subject of the statements without reciting the precise words).

Measured against the flexible standard of Rule 9(b), Future Tech's allegations of fraud in counts II, VI and VII are sufficient to withstand a motion to dismiss.[13] Among its allegations, Future Tech asserts the following with regard to Park:

In a May 25, 1995 letter from Defendant Andrew Park to Plaintiff, Defendant Park indicated that the Defendants would try to do their best to maintain production of 20,000 monitors per month. Dealing specifically with MarkVision systems, that letter falsely described the need to increase the costs of the system because of an increase in costs for motherboards, case covers, etc. The letter continued by indicating that Defendant Tae Il Media, Ltd. was repudiating its prior agreements and would only honor the original pricing for the first shipment of 1,000 units.

Compl. at ¶ 69. The complaint also alleges that Defendants Tae Il Media and Techmedia made fraudulent representations on various other occasions. *Id.* at ¶¶ 27, 28, 31, 32, 52. The complaint asserts that Park has acted as

---

**13.** The allegations underlying these counts are reproduced in section IV of this Order. Although Counts VI and VII are styled "Theft of Trade Secret," and "Breach of Fiduciary Duty," respectfully, Park contends that they are subject to dismissal on Rule 9(b) grounds in the same manner as Count II, which alleges fraudulent inducement. Because we hold that the allegations are sufficient to put Park on notice of the alleged fraud, we need not separately consider the interplay between Rule 9(b) and Counts VI and VII.

the representative of Defendant Tae Il Media. *Id.* at ¶ 10.

Park's principal argument is that the complaint "repeatedly makes blanket references to acts or omissions of all defendants," and that the allegations are not specific as to the places, dates and times of the alleged fraudulent remarks. We are unpersuaded. To begin with, while allegations of date, time or place fulfill Rule 9(b)'s function, nothing in the Rule requires them. *Colonial Penn Ins. Co. v. Value Rent–A–Car Inc.,* 814 F.Supp. 1084 (S.D.Fla.1984). Moreover, in *Selgrad v. U.S. Lending Corporation,* this Court made the following pertinent observations:

> At the outset the Defendants contend that the Plaintiffs' allegations of fraud are inadequate because the complaint attempts to attribute all of the asserted misconduct to the "Defendants" or the "USL Defendants" as a group—instead of describing the specific acts that each of the Defendants undertook. However, many courts have recognized that group pleading is appropriate where the Defendants are insiders or affiliates of the corporate Defendant and the allegedly false information is disseminated through documents or correspondence in the name of the corporation. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987); *In Re MTC Electronic Technologies Shareholders Litig.,* 898 F.Supp. 974, 979–80 ( [E.D.N.Y.] S.D.N.Y.1995) (citing *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987)); [*In re*] *Sahlen* [*& Associates, Inc. Securities Litig.*], 773 F.Supp. [342] at 362 [ (S.D. Fla. 1991) ]. These cases rest on the presumption that insiders are familiar with the drafting and publication of the materials containing the alleged misrepresentations. Thus, it is not a requirement, at this point, for Selgrad to describe the exact connection between each fraudulent representation and the discrete acts of the insider Defendants. As to these Defendants, it is enough that Plaintiff describe the circumstances surrounding the fraudulent statements and establish at least some link between the statement and the asserted conduct.

Case No. 95–2053–CIV–MARCUS, Order Grant. in Part and Den. in Part Def. Mot. to Dismiss and Stay (S.D.Fla. March 20, 1996), at 20–21. On the other hand, in another recent opinion from this Court, *Brooks v. Blue Cross/Blue Shield,* which Park cites, we concluded that the plaintiffs' allegations of fraud did not meet the standard set forth in Rule 9(b). In particular, we were concerned that the plaintiffs had "lumped together" all of the defendants, especially since the complaint was otherwise "devoid of specific allegations." Case No. 95–405–CIV–MARCUS, Order (S.D.Fla. September 22, 1995), at 40–43.

We think that this action is more like *Selgrad* than *Brooks.* As in *Selgrad,* more generalized pleading or "group pleading" is permissible in the corporate context if the plaintiff alleges a link between the individual Defendant, his corporation and the allegedly fraudulent conduct. Although more detailed pleading would certainly satisfy Rule 9(b), Future Tech's allegations concerning Park and his role in the asserted fraud are not so vague or devoid of particularity as to provide Park with insufficient warning of the charges against him. As documented above, Future Tech specifically pleads that Park engaged in fraud in connection with the May 25, 1995 letter, and asserts that Park played at least some meaningful role in the allegedly fraudulent conduct of the affiliated corporate Defendants. In the final analysis, greater specificity is not required under Rule 9(b), since the allegations place Park, as well as the corporate Defendants, on adequate notice to permit them to defend against the fraud claims. Although in the course of discovery additional facts concerning the alleged fraud will no doubt be added to the record, this is not a case where the Plaintiff has relied on wholly conclusory allegations at the pleading stage while hoping to dredge up every fact conceivably supporting a fraud claim through a "fishing expedition" during discovery. In short, under these facts and circumstances, Park's request that we dismiss portions of the complaint for failure to plead fraud with particularity is not persuasive.

It is, therefore,

ORDERED AND ADJUDGED that Tae Il Media's emergency motion for pre-judgment replevin, attachment and/or preliminary injunction and order to show cause is DENIED. Defendants Tae Il USA, Techmedia and Otomation's motion to dismiss for lack of personal jurisdiction is GRANTED as to Defendant Tae Il USA, and the Plaintiff's complaint is DISMISSED as to this Defendant. The motion is DENIED as to the other Defendants. Defendants Tae Il USA, Techmedia and Otomation Rule 12(b)(6) motion to dismiss, Tae Il USA, Techmedia, Otomation and Park's Rule 56 motion for summary judgment and Park's motion to dismiss are all GRANTED IN PART and DENIED IN PART. The Plaintiff's breach of contract claims in Counts I, III, IV and IX are DISMISSED to the extent that they concern these Defendants. In all other respects, the motions to dismiss and motions for summary judgment are DENIED.